## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | |
|---|---|
| DAVID EARL MILLER, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) NO. 3:01-CV-487 |
| | ) (Jordan/Carter) |
| RICKY BELL, Warden, | ) |
| | ) |
| Respondent. | ) |

## **MEMORANDUM OPINION**

### **I. INTRODUCTION**

Following his 1982 Knox County conviction of first-degree murder, sentence of death, and pursuit of direct and collateral review in the state courts, petitioner David Earl Miller ["Miller"] filed this petition and amended petition for habeas corpus relief under 28 U.S.C. § 2254. Thereafter, both parties moved for summary judgment—Miller with respect to one claim and respondent with respect to all claims raised in the amended petition. The Court denied the former motion; granted the latter; denied the petition; dismissed the case; and granted issuance of a Certificate of Appealability with respect to four of Miller's twenty-five grounds for relief.

Now before the Court are Miller's motion to alter or amend that judgment pursuant to Fed. R. Civ. P. 59(e); a response in opposition by respondent warden; Miller's reply to the Warden's response; and Miller's two notices of supplemental authority. [Docs. 87, 89-90, 93-94].

Respondent, pursuant to the Court's order, has supplemented the record with the technical record of Miller's state post-conviction proceedings. [Doc. 100, Addenda 33, 34]. For the following reasons, the Court will **DENY** Miller's motion.

## II. FACTUAL & PROCEDURAL BACKGROUND

In the early evening hours of May 20, 1981, Miller, who was at the Hideaway Lounge in downtown Knoxville, had a telephone conversation with Lee Standifer. Ms. Standifer had been seen previously with Miller at a cafeteria at the bus station. Miller met her a few blocks away at the Y.W.C.A., where she lived, and together they visited the Hideaway Lounge, the Knoxville Public Library, and the bus station cafeteria. Afterwards, Miller hired a taxi and he and Ms. Standifer were driven to West Knoxville and dropped off near the home where Miller was living. This is the last time Ms. Standifer was seen alive.

Later that evening, the homeowner, Mr. Benjamin Calvin Thomas, returned to find wet floors in his basement garage and upstairs kitchen and two streams of blood leading from the living room to the dining room and kitchen area. Thomas asked about the condition of the floors, and Miller explained that he had "hosed" out the basement floor to clean it and had received a bloody nose in a fight. Thomas told Miller that he must leave, and early the next morning, with the understanding that Miller intended to hitch-hike to Texas, Thomas drove him to a nearby Interstate exit.

Returning home that evening, Thomas saw a blue T-shirt hanging from a dogwood tree in his backyard and, underneath another tree in an adjoining leaf-filled thicket, a nude female body lying face-up. The face, head, and portions of the body were covered in dried blood; the arms were stretched up over the head; and rope had been tied around the neck, wound up to bind the wrists, and

2

extended to a length sufficient to drag the body.

During the investigation which followed, Miller became a suspect. Days later, he was apprehended in Ohio, and, after waiving extradition, was returned to Knoxville. There, he confessed and was tried for first-degree murder; convicted; and sentenced to death. On direct appeal, his conviction was affirmed, but his sentence was vacated and the case was remanded for a new sentencing hearing. *State v. Miller*, 674 S.W.2d 279 (Tenn. 1987). Apparently, the first re-sentencing hearing ended in a mistrial. [Addendum 7, vol. 3 at 117, 132-33]. However, at the second hearing, Miller again received the death penalty. The state supreme court denied his second direct appeal, and the United States Supreme Court denied his subsequent petition for a writ of certiorari. *State v. Miller*, 771 S.W.2d 401 (Tenn. 1989), *cert. denied*, 497 U.S. 1031 (1990). He was unsuccessful in obtaining post-conviction relief, *Miller v. State*, 1999 WL 1046418 (Tenn. Crim. App. Nov. 19, 1999); *Miller v. State*, 54 S.W.3d 743 (Tenn. 2001), or further review by the Supreme Court. *Miller v. Tennessee*, 536 U.S. 927 (2002). This petition for habeas corpus relief under 28 U.S.C. § 2254 then followed.

### III. RULE 59(e) MOTION

In his motion to alter or amend, Miller challenges the Court's substantive and/or procedural disposition of eleven of the twenty-five claims offered in his petition, i.e., Claims I-III, VII (part), IX, X, XV, XVI, XVII, XIX, and XXIV, suggesting that the Court overlooked or misapprehended relevant law and facts in granting summary judgment to respondent.

Rule 59(e) authorizes motions to alter or amend a judgment if filed within ten days. However, under Rule 59(e), the district court has considerable discretion as to whether to alter or

3

amend or reconsider an earlier ruling. *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993); *Columbia Gas Transmission Corp. v. Ltd. Corp.*, 951 F.2d 110, 112 (6th Cir. 1991). The court must balance the need for finality with the need to render just decisions. *Edward H. Bohlin Co., Inc.*, 6 F.3d at 355. However, "[i]n practice, because of the narrow purposes for which they are intended, Rule 59(e) motions typically are denied." Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 2810.1 at 128; *see also Ruscavage v. Zuratt*, 831 F. Supp. 417, 418 (E.D. Pa. 1993) (noting Rule 59(e) motions "should be granted sparingly because of the interests in finality and conservation of judicial resources"). A Rule 59(e) motion is "aimed at *re*consideration, not initial consideration." *F.D.I.C. v. World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir. 1992) (citations omitted). Thus, the motion should "either clearly establish a manifest error of law or must present newly discovered evidence," *id.,* or show an intervening change in controlling law. *GenCorp, Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 834 (6th Cir. 1999);

## IV. LAW AND ANALYSIS

To streamline the discussion, the Court has divided the claims into two principle categories, as did Miller in his Rule 59(e) motion.

### A. **Adjudicated Claims**

#### 1. *The Ake Claims* [Pet., Claims I and II]

In these claims, Miller alleges that he was denied his constitutional right to his own mental health expert to assist in his defense at trial. Citing *Ake v. Oklahoma*, 470 U.S. 68 (1985), Miller asserts that it violates due process, equal protection, and his right to the effective assistance of counsel to deny him, as an indigent defendant, the funds to hire his own expert, given that "[t]here

4

is no doubt but that Mr. Miller's mental health was substantially in question during the guilt phase of his capital trial." [Doc. 87 at 5].

a. *Retroactivity Question*

Miller's first argument is that, contrary to what the Court held in its prior opinion, these claims are not barred by the doctrine in *Teague v. Lane*, 489 U.S. 288 (1989).[1] Respondent offers no straightforward response to Miller's argument, apparently abandoning his previous position that application of the *Ake* rule is barred by the *Teague* doctrine. Instead, respondent insists that, under § 2254(d)'s standards, the controlling legal rules for this claim are to be found in Supreme Court holdings as of the time of the state court's 1984 decision. He further explains that a state court cannot be faulted when its opinions do not encompass legal principles or analytical guidelines not yet promulgated. These arguments, whether correct or not, do not undermine Miller's position that his claim is not *Teague*-barred—a position with which the Court agrees.

The Supreme Court has held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Griffith v. Ky.*, 479 U.S. 314, 328 (1987). *Ake* was decided on February 26, 1985, and Miller's conviction did not become final until June 28, 1990, after his direct appeal from his re-sentencing, when the Supreme Court denied *certiorari* in *Miller v. Tennessee*, 497 U.S. 1031 (1990). *See Burton v. Stewart*, 127 S. Ct. 793, 798-99 (2007) ("Final judgment in a criminal case means sentence. The sentence is the judgment") (citing *Berman v. United States*, 302 U.S. 211, 212 (1937)); *Griffith*, 479

---

[1] *Teague* holds that, generally, new constitutional rules of criminal procedure do not apply to cases which have become final before the new rules are announced. *Id.* at 310.

U.S. at 321 n. 6 ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied"); *Flynt v. Ohio*, 451 U.S. 619, 620 (1981) ("Applied in the context of a criminal prosecution, finality is normally defined by the imposition of the sentence.").

Though Miller might have pursued further review of the state supreme court's 1984 decision affirming his conviction, *see Brady v. Maryland*, 373 U.S. 83, 85 n.1 (1963),[2] he was not required to do so for *Teague* purposes. *But see Gretzler v. Stewart* 112 F.3d 992, 1004 (9th Cir. 1997) ("Where a judgment of conviction has been upheld by a state's highest tribunal and the vacation of a sentence is on grounds wholly unrelated to the conduct of the trial, that conviction is final for purposes of retroactivity analysis.... The fact that [petitioner] chose not to file a petition for writ of certiorari [at that time] is irrelevant."). Accordingly, since Miller's case had not yet become final when *Ake* was decided, and though one sister circuit has determined otherwise, *see Gretzler*, the better view is that there is no *Teague* retroactivity issue and, thus, the *Ake* issue is properly before the Court. *Danforth v. Minn.*, 128 S.Ct. 1029, 1047 (2008) (A question as to whether constitutional violations occurred in trials conducted before a certain date does not depend "on how much time was

___

[2] In *Brady*, the state courts had ordered a new penalty phase and the petitioner, as does Miller, asserted that he was also entitled to a new guilt-phase trial based on constitutional error. Here, as in *Brady*, the *Ake* issue was separable and would not have been mooted by Miller's new sentencing trial. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 480-81 (1975). Yet, Miller did not pursue further review relief in the Supreme Court after Tennessee's highest court affirmed his conviction and remanded the case for a new penalty trial—a somewhat surprising decision given his attorney's prediction that "Mr. Miller will ultimately win a new trial on the psychiatric expert issue. [Addendum No. 3, Motion for a New Trial on Guilt/Innocence, and/or To Prohibit a Sentencing Hearing, at ¶ 16]. Moreover, had Miller sought such relief, given that the *Ake* case was in the pipeline around that time [id. at ¶ 13], Miller's case might have been remanded to the state court to reconsider its decision in light of *Ake*.

required to complete the appellate process").

b. *Background*

Because *Ake* applies, the circumstances surrounding these claims will be examined in greater detail than in the Court's earlier opinion.[3]

Prior to his trial, Miller's lawyers sought an expert to determine whether he met the criteria of insanity at the time of the crime and whether he was able to form the intent to premeditate the murder. More specifically, on October 19, 1981, trial counsel filed a petition for a psychiatric examination and evaluation. The purpose of this request, counsel explained, was to determine his client's mental condition at that time, his competency to stand trial, his mental capacity at the time of the crime, and his capacity to either appreciate the wrongfulness of his conduct or conform his conduct to the law. In the petition, counsel stated he had serious reservations about Miller's present competency and his sanity because "[t]he circumstances surrounding the death of the alleged victim indicate that the person or persons involved are seriously disturbed, and [t]he notoriety of [Miller's] case has increased the already extreme pressure placed upon [him] to the point where [his] competence is now in question." (Addendum No. 3, vol. 1 at 10).

The request was granted, and the trial court ordered a psychiatric examination to be performed by qualified staff members of the Helen Ross McNabb Mental Health Center to determine

---

[3] In the earlier opinion, the Court found that Miller had procedurally defaulted that part of Claim I in which he contended that "mental infirmities, either independently or when combined with the impairment of hallucinogenic drugs and alcohol" deprived him of the ability to form the intent required for a first degree murder conviction. (Doc. 85 at 12). If the earlier finding, as Miller has alleged in his Rule 59 motion, resulted from a "hypertechnical" interpretation of the default rules, the Court will include that part of Claim I in this analysis and will issue a ruling in the alternative.

7

"whether the defendant is mentally competent to advise with counsel for the trial of his case, and to make a further determination of whether the defendant was mentally competent and understood the nature and consequences of his acts on or about the 21st day of May, 1981." (*Id*. at 12, October 19, 1981 Order of Judge Richard R. Ford). The state court further directed the medical authorities to furnish it with a report of their findings and "advise the Court of their opinion as to whether the defendant is mentally ill to the extent that he cannot sufficiently understand the nature and object of the proceedings going on against him, and cannot advise with counsel in a rational manner . . . . Additionally, the medical authorities will make a determination as to whether the defendant was mentally competent and understood the nature and consequences of his acts on or about May 21, 1981, and will report said findings to the Court." (*Id.* at 12-13).

Although it is unclear whether the trial court was aware of Miller's prior mental examination, he had previously been evaluated by Dr. George L. Gee Jr., of the Helen Ross McNabb Center, as evidenced by Dr. Gee's June 12, 1981 letter.[4]

The mental status examination revealed

a well developed, well nourished white male, cooperative for examination. Affect is normal and he does not describe any psychotic content in the nature of auditory or visual hallucinations or paranoid delusions. He has never had any convulsions. He

---

[4] Apparently, the June letter was in response to an order filed in the Knox County General Sessions Court, directing that Miller be examined by a certified psychologist or psychiatrist at the Helen Ross McNabb Forensic Service Program. (Addendum No. 7, Mot. Hr'g Tr., May 10, 1985, Exs. 1, 2). The issuance of that order, in turn, resulted from the defense's June 1981 petition for a psychiatric examination to determine Miller's competency. (*Id.*) The record also contains two other letters, dated June 18 and November 9 of 1981, signed by two different clinical psychologists, both of whom were with the Forensic Service Program at the Helen Ross McNabb Center—a Philip C. Kronk and one Neal W. Dye, stating that each expert, pursuant to court orders, had evaluated Miller for competency and had found him competent to stand trial. (Addendum No. 4, vol. 15c, Exs. 2, 30).

8

was in an accident in which a car went through a brick wall in 1974. He has used alcohol rather heavily, smoked pot a lot, occasionally used acid. He was in the Marines July, 1974 until September, 1976, got a bad conduct discharge. He went AWOL, came back, cursed a noncom, went AWOL again. In regard to the charges, he said he had known this woman about three weeks, that she called him to come and pick her up at the YWCA, that he did strike her after she dug her nails into his arm because he was leaving town. He says he doesn't know how she got killed. This man describes all of this without a great deal of emotion. Sensorium is grossly intact. The initial opinion is that he is sociopathic but certainly mentally competent to stand trial.

(Addendum No. 7, vol. 9, Ex. 1).

In response to the October 19th order, Dr. Gee submitted another letter, advising that Miller had "been in the county jail since June and Betty Hart tells me that she has had no problems with him, and his behavior and thought content have appeared normal. He is not on any nerve medication." (*Id.*) Dr. Gee recounts in the letter that Miller reported that he had earned a GED; that he was a welder in the past; that his last job as a welder was at Byrd Manufacturing; that he was a cook at his last job, which was at the Trailways Restaurant; that he was single and had never been married, though he had a child; that both parents were living; that he had one brother and four sisters; and that neither he nor his family had a history of mental illness. The letter also included the following:

His affect is normal, thought processes normal. He does claim that he had a few seizures, age 12 or 13, took medication, then outgrew them. He has been a heavy drinker, denies any drugs to speak of at present. He never had any bedwetting, had one episode of sleep walking about age seven or eight. He denies any abnormal mental content at this time but claims that he did hear some voices which stopped about three months ago, calling his name, telling him to do this, that or the other and so forth. I am not impressed with any psychosis, however. He has no physical complaints at the present time and looks quite rational.

I don't believe that he was insane at the time of the offense, and I don't believe he is insane now, and a letter is being written to the Judge in his regard.

9

(*Id.*)

On December 11, 1981, some two months later, Miller filed a motion for appointment of a psychiatrist to "refute the specific intent of premeditation requisite to a conviction for murder in the first degree" because he was under the influence of various hallucinogenic drugs at the time of the offense. (Addendum No. 3, vol. 1 at 46). He also sought to have the expert assist him in the penalty phase of trial. The trial court held a hearing on the motion, listened to the parties' arguments, and denied the defense's request. (*Id*. at 150).

Following his trial and sentencing, Miller filed a motion for a new trial, renewing his claims that the denial of his own psychiatric expert to assist in the preparation of his defense and that the admission of Dr. Gee's testimony to rebut his claim of insanity violated his constitutional rights. This motion likewise was denied. Miller then carried the claims to the state supreme court for review, (Addendum No. 5, Pet.'r's Direct App. Br.), where they were disposed of with the following ruling: "We have carefully considered all of the other issues presented on appeal and are satisfied that the record fully supports the conviction of the accused." *State v. Miller*, 674 S.W.2d 279, 284 (Tenn.1984).[5]

c. *Standard of Review for Adjudicated Claims*

Review of claims which have been adjudicated in the state courts is constrained by the standards in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under those standards,

---

[5] Miller brought the issue up again at his re-sentencing and in his second direct appeal, but the state supreme court refused to entertain it, holding that issues relating to the guilt phase of trial were not relevant to resentencing; that they had been dealt with in its 1984 opinion; and that they were now foreclosed, except for those that properly could be raised in post-conviction proceedings. *State v. Miller*, 771 S.W.2d 401, 402-03 (Tenn. 1989).

10

a writ of habeas corpus may issue only when the adjudication of the claim on the merits results in a state-court decision which: (1) is contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or (2) was based upon an unreasonable determination of the facts in light of the evidence before the state courts. *See* 28 U.S.C. § 2254(d)(1) and (d)(2). Also, a state court's factual finding is presumed correct, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(d).

However, because there was no reasoning or analysis underlying the state court's decision on the denial-of-an-expert claim, the Court employed, in its prior opinion, a modified AEDPA deference—an approach which entails a careful, independent—but not de novo—review of the state court record and the applicable law to determine whether it passes the tests of § 2254(d)(1). *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *see also Hawkins v. Coyle*, 547 F.3d 540, 546-47 (6th Cir. 2008) (explaining that, when the state court disposes of a claim with little-to-no articulated analysis, the habeas inquiry focuses "on the *result* of the state court's decision") (quoting *Harris,* 212 F.3d at 943 n.1) (emphasis in original). Under this type of AEDPA review, as always, a state court decision will be disturbed only when it is contrary to or an unreasonable application of federal law. *Harris,* 212 F.3d at 943.

That the 1985 *Ake* decision applies to this case under the retroactivity rule in *Teague* presents the Court with a possible conundrum. This is so because AEDPA directs a habeas court to look for the controlling legal rule only in "clearly established Federal law," meaning "the holdings, as opposed to the dicta of the [Supreme] Court's decisions *as of the time of the relevant state-court decision,*" *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (italics added), and because, in the instant case, Miller's claim that he was constitutionally entitled to an independent psychiatrist was rejected

11

by the Tennessee's highest court in 1984—the year *before* the United States Supreme Court issued *Ake*.

However, as Miller aptly argues and as the Court recognizes, broad general principles, as well as bright line rules, may be sufficiently clear for habeas purposes. *See Williams*, 529 U.S. at 382 (citing *Wright v. West*, 505 U.S. 277, 308-09 (1992) (Kennedy, J., concurring in judgment)). Therefore, the Court may look to decisions of other courts in determining whether a legal principle was clearly established by the Supreme Court in 1984. *Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009) (citing *Smith v. Stegall*, 385 F. 3d 993, 998 (6th Cir. 2004)). According to Miller, it was clearly established by the Supreme Court, as of 1984, that the State must ensure indigent defendants meaningful access to justice, which includes the basic tools of an adequate defense.

That may be so, but the Court's survey of the legal landscape as of 1984 discloses that the only Supreme Court decision which addressed whether the Constitution requires a state to provide psychiatric assistance to an indigent criminal defendant was *United States ex rel Smith v. Baldi*, 344 U.S. 561 (1953). There, the death-sentenced defendant had adduced some proof of insanity and, at the trial court's request, had undergone a mental examination. Taking into account the prior evaluation, as well as the fact that neutral psychiatrists had testified as to the defendant's sanity at the time of the offense and at the time of trial, the Supreme Court found no constitutional violation, succinctly stating: "As we have shown, the issue of petitioner's sanity was heard by the trial court. Psychiatrists testified. That suffices." *Id.* at 568.

Thirty-two years thereafter, *Ake* was decided. There can be no doubt, as Miller points out, that *Ake* was informed by the broad general principle that indigent defendants are guaranteed

12

meaningful access to justice and are entitled to the basic tools of an adequate defense, as stated in pre-1984 Supreme Court cases—*Griffin v. Illinois*, 351 U.S. 12 (1956); *Gideon v. Wainwright*, 372 U.S. 12 (1963); *Douglas v. California*, 372 U.S. 353 (1963); *Roberts v. LaValle*, 389 U.S. 40 (1967); and *McMann v. Richardson*, 397 U.S. 759 (1970). *See also Medina v. Cal.*, 505 U.S. 437, 444-45 (1992) ("The holding in *Ake* can be understood as an expansion of earlier due process cases holding that an indigent criminal defendant is entitled to the minimum assistance necessary to assure him 'a fair opportunity to present his defense' and to participate meaningfully in [the judicial] proceeding.'") (citing *Ake*, 470 U.S. at 76). However, logic compels the conclusion that, if the *Griffin*-line of cases had settled, once and for all, the sought-after constitutional rule on state-funded psychiatrists, there would have been no need for the Supreme Court to issue its ruling in *Ake*. Seemingly confirming this conclusion is the explanation for the rule contained in the decision itself: "[W]e neither approve nor disapprove the widespread reliance on psychiatrists but instead recognize the unfairness of a contrary holding *in light of the evolving practice*" and *"[s]hifts in [the law, legal procedures, and legislative enactments] since the time of Smith* convince us that the opinion in that case was addressed to altogether different variables, and that we are not limited by it in considering whether fundamental fairness *today* requires *a different result.*" *Ake*, 470 U.S. at 82, 85 (emphasis added).

The *Ake* rule was not merely a refinement of the principle enunciated in *Gideon*—it was a bright-line rule. In each of the above cited pre-1984 cases, the Supreme Court identified, one by one, the "tools" which were essential to an indigent accused's defense—an attorney at trial; an attorney in the first appeal as of right; a preliminary hearing transcript; and an attorney who does not render ineffective assistance. An independent psychiatrist for an indigent defendant paid for by the State

13

was not listed as a "basic tool" in any of these cases. Before *Ake*, the bright-line rule that a state must furnish a psychiatric expert for an indigent accused was not sufficiently clear to be considered a "well established Federal law." *See Williams*, 529 U.S. at 381 (relief precluded if the Supreme Court has not "broken sufficient legal ground"on a constitutional principle advanced by a petitioner); *Gretzler*, 112 F.3d at 999 ("Up to that time [i.e., prior to 1985], without *Ake,* a state court had no reason to conclude that a criminal defendant had a constitutional right to state-funded psychiatric assistance at any stage of a criminal proceeding") (citation omitted). The *Ake* holding, therefore, cannot qualify as "a well established federal law" as set forth in AEDPA. *See also Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citations and internal quotation marks omitted). Applying a 1985 Supreme Court precedent to a 1984 state court decision simply cannot be harmonized with the review limitations under AEDPA.

Therefore, though the *Ake* rule is not *Teague*-barred, it does not supply the governing legal rule for these claims because, in 1984, the *Ake* rule did not even exist in Supreme Court jurisprudence. As the Sixth Circuit has noted, "even if the Supreme Court had stated the rule sought by petitioner in a decision issued after petitioner's trial, petitioner could not rely upon it. The rule must have been 'as of the time of the relevant state court decision.'" *Harris*, 212 F.3d at 945 n.2; *see also Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009) (citing *Williams*, 529 U.S. at 412); *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) ("Section 2254(d) limits a federal court's habeas review to the clearly established federal law as set forth by the Supreme Court at the time the state court rendered its decision.") (citing *Williams*, 529 U.S. at 412, and *Lockyer v. Andrade*, 538 U.S.

14

63, 71-72 (2003)). Thus, the survey of the legal landscape in 1984; the analysis of law and fact; and the conclusions contained the Court's prior order hold true. There is no need to alter or amend that order with respect to the *Ake*-related claims.

But, if it were possible to overcome the reality that, under a *Teague* analysis, *Ake* was "new law,"[6] whereas "old law" functions as "well established Federal law" under § 2254(d), *Williams*, 529 U.S. at 412 ("Whatever would qualify as an old rule under [the Supreme Court's] *Teague* jurisprudence will constitute 'clearly established Federal law.'"), and if it is assumed that *Ake* supplies the governing legal rule for this claim, no different conclusion would be called for. *See Thompkins v. Berghuis* 547 F.3d 572, 580 (6th Cir. 2008) ("The lack of an explicit statement" of a rule "is not determinative" because "[t]he Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent.") (quoting *Taylor v. Witherow*, 288 F.3d 846, 852 (6th Cir. 2002)).

d. *Ake violation*

*Ake* held that an indigent defendant who shows that sanity at the time of the offense is likely

---

[6] A case "announces a new rule when it breaks new ground or imposes a new obligation on the States or the federal government." *Teague v. Lane,* 489 U.S. 288 (1989). On the other hand, if a state court considering a federal claim would have felt compelled by existing precedent to conclude that the sought-for rule was constitutionally required, then it is clearly established and not new. *Id*. at 923. As Miller's attorneys recognized, the State's obligation under *Ake* was new. Addendum 8, Pet'r's App. Brf. at ix [Re-sentencing]. Surprisingly, however, Miller presented only penalty-phase claims in his petition for certiorari to the Supreme Court on direct review and omitted his *Ake* claims, though his pleading was filed in the October 1989 term — more than four years post-*Ake*–and though he might have obtained the relief he sought had he so done. (Addendum 13). *See, e.g., Nichols v. United States*, 563 F.3d 240, 242 (6th Cir. 2009) (en banc) (noting that the only way a defendant could have obtained the benefit of a change in the law was by petitioning the Supreme Court for certiorari, "which he did not do" and that his co-defendant who had taken that further step in the review process had secured the benefit of the change).

15

to be significant factor at trial must be afforded access to a competent psychiatrist, *Ake v. Oklahoma,* 470 U.S. 68, 83 (1985), but limited that right to one competent psychiatrist, which the state could select. *Id.* at 78-79 and 83. And, while the psychiatrist was "to conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense," *id.* at 83, *Ake* did not necessarily require that the state-funded expert be an independent one. *See Smith v. Mitchell*, 348 F.3d 177, 208 (6th Cir. 2003); *contra Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003) (finding that a court appointment of a neutral psychiatrist does not satisfy the constitutional right to psychiatric assistance for insanity defense) (pre-AEDPA decision). Moreover, *Ake* is triggered only where a defendant makes a threshold showing that his mental condition is "seriously in question." This showing is made by supplying particular facts demonstrating the necessity of a psychiatrist, not just by making general allegations of need.

### (1) *Threshold Showing*

First of all, *Ake*'s explicit holding involved only the issue of sanity, not criminal intent. *See Kordenbrock v. Scroggy*, 919 F.2d 1091, 1104 (6th Cir. 1990) (*en banc*) (finding that, under *Ake*, an indigent capital murder defendant has no right to a state-funded psychiatrist to assist him in a diminished capacity defense). Negating criminal intent was the purpose for which Miller sought expert assistance in his October, 1981 motion. (Addendum No. 3, Vol. 1, p. 46, requesting an expert to "refute the specific intent of premeditation").

Secondly, as the Court noted in its prior opinion, it was unlikely that Miller made a "threshold showing" to demonstrate to the trial court that his sanity was likely to be a substantial issue at trial. This threshold was reached in *Ake* upon the following facts: Insanity was Ake's only

16

defense; his bizarre behavior at the arraignment and other proceedings spurred the trial court, *sua sponte*, to order a competency examination; the state psychiatrist who conducted the examination found Ake incompetent to stand trial; the expert's six-weeks-later finding of competency to stand trial was conditioned on Ake's continued sedation with three, large daily doses of Thorazine, a powerful anti-psychotic medication; at the trial, there was no evidence with respect to Ake's sanity; Ake "stared vacantly ahead throughout the trial"; the psychiatrist who made the competency findings suggested that Ake's mental illness might have begun years earlier; and Ake had the initial burden of adducing proof to support the insanity defense. *Ake,* 470 U.S. 71-74.[7]

In Miller's case, insanity was not his only defense; evidence on sanity was introduced at trial [albeit over his objection]; the record contains nothing to suggest that he required sedation or medication to be competent to stand trial; and his conduct at the trial apparently was exemplary. And though Miller bore the burden of sufficiently raising the issue of sanity, nothing in the state court record suggests that he had a mental illness at the time of the trial, at the time of the crime, or at any time before the crime. *See Williams v. Schriro*, 441 F.3d 1030, 1048 (9th Cir. 2006) *(Ake* does not require the appointment of a mental health expert whenever a defendant is contemplating an insanity defense; rather a defendant must make a threshold showing that the appointment is reasonably necessary.).

True, the circumstances surrounding the murder were macabre. But the strangeness of the

---

[7] The Supreme Court has offered no further guidance as to what facts make a threshold showing. In a post-*Ake* decision, where a capital defendant had asked for an investigator and ballistics and fingerprint experts, the Supreme Court found "no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought." *Caldwell v. Miss.*, 472 U.S. 330, 323 n.1 (1995).

murder, standing alone, would not have alerted the trial court of the State's obligation to furnish Miller with his own psychiatric expert. *Ake*, 470 U.S. at 90 ("The evidence of the brutal murders perpetrated on the victims, and of the month-long crime spree following the murders, would not seem to raise any question of sanity unless one were to adopt the dubious doctrine that no one in his right mind would commit a murder.") (Rehnquist, J., dissenting); *Hill v. United States*, 22 App. D.C. 395, 1903 WL 18661. *7 (D.C. Cir. 1903) (The atrocity of the crime and the ensuing publicity are not enough for an inference of insanity; otherwise, every defendant could assert a claim of insanity "by simply committing his crime with all the atrocious cruelty that he could employ."); *but see Hintz v. Beto*, 379 F.2d 937, 938-41 (5th Cir. 1967) (The accused had shown a "fair factual basis" for questioning his sanity at the time of the crime where, *inter alia*, he was charged with a murder under circumstances suggestive of a mental disturbance on the part of the perpetrator).[8]

Of course, as a further basis for his October 1981 motion, Miller pointed to the stressful situation to which he allegedly was exposed as a result of the notoriety of his pending case, which he claimed had placed his competency in question. The same thing, no doubt, could be said of any citizen accused of a capital crime. *See Panetti v. Quarterman,* 127 S.Ct. 2842, 2852 (2007) (observing that "[a]ll prisoners are at risk of deteriorations in their mental state"). "In order for a defendant's mental state to become a substantial threshold issue, the showing must be clear and genuine, one that constitutes a close question which may well be decided one way or the other." *Liles*

---

[8] The defendant in *Hintz,* who had a history of alcoholism and mental problems, had struck his wife in the head with a water bottle, wrapped her body in a sheet or a blanket, hidden it under the bed, and, until he was arrested eleven days later (one day after the body was found), slept in his car, loaded with household items and cookware, which had been seen parked around the neighborhood where the crime occurred.

18

*v. Saffle,* 945 F.2d 333, 336 (10th Cir.1991). The mental pressure ancillary to a criminal prosecution is simply not the kind of fact which shows that *sanity* will be a prominent issue at trial.

Miller disagrees with the Court's conclusion that he failed to make a threshold showing that his sanity would be seriously in contention, maintaining that not only did he make the requisite showing that his mental condition would be a substantial issue, but that the trial court, by appointing a mental health expert, demonstrated that it too believed that his mental health was significantly in question. Contrary to this assertion, the record does not show that the state trial court appointed psychiatric mental health expert because *it* questioned his mental condition. Instead, the appointment of the expert was prompted by *trial counsel*'s request for a psychological evaluation.

Furthermore, Miller's post-conviction attorneys apparently reached the same conclusion as did this Court. They conceded that trial counsel's motion for funds "did not set out a specific factual basis showing the need for psychological assistance"and characterized the motion as "essentially a bare bones request for funds." [Addendum No. 34, Post-Conviction Motion for Funds at ¶ 5].

Miller's next arguments are extensions of the first one, i.e., that the state courts, by making certain rulings, recognized that he had sufficiently placed his mental health at issue. Miller alleges that the prosecution introduced expert psychological testimony on the issue of sanity, but not until the trial court itself determined that the sanity issue had been sufficiently raised by Miller's questioning of lay witnesses as to his behavior on the day of the crime and by the pathologist's testimony explaining the cause of death and detailing the victim's injuries. Further, to support the assertion that his mental condition was seriously in contention, Miller points out that the trial court submitted to the jury the issue of his sanity and that the state supreme court analyzed his insanity defense.

19

The Court agrees that one of the defenses Miller asserted was insanity. However, a review of the record discloses nothing to support the trial court's determination that Miller had raised a reasonable doubt as to his sanity. Indeed, the decision of the highest state court to entertain this claim, substantiates this view:

> In our opinion, no evidence was introduced by either the State or the defendant sufficient to raise a reasonable doubt as to defendant's sanity, unless it could be said that atrocious, brutal acts inflicted upon Lee Standifer, in and of themselves, were sufficient to do so. However, a psychiatrist who examined defendant in June and November of 1981 was called by the State and expressed the opinion that defendant was not suffering from any mental disease or defect at the time of the murder, that he knew right from wrong and was able to conform his conduct to the requirements of the law. Thus, if a jury question existed as to whether defendant's sanity was proven beyond a reasonable doubt, that issue was submitted to the jury under a correct charge by the trial judge and they necessarily found that defendant was sane. The record contains substantial material evidence to support such a finding in addition to the testimony of the psychiatrist.

*State v. Miller*, 674 S.W.2d 279, 282 (Tenn. 1984); *see Garcia v. Andrews*, 488 F.3d 370, 374 (6th Cir. 2007) ("In applying AEDPA, we look to the last state-court decision on the merits . . . "). Granted, Miller attempted to make his sanity a substantial issue during trial by suggesting that the gruesomeness of the crime indicated that he was seriously disturbed, as did his auditory hallucinations and ingestion of psychogenic substances. (Addendum 4, vol. 11, Gee Test. at 945-54). But as the Court has already found, the savagery of the murder does not suffice to make the requisite preliminary showing. As to the auditory hallucinations, Miller did not claim that they occurred at the time of the murder, and the expert testified at trial that they were not psychotic hallucinations. Likewise, though Miller maintained in his statement that he was intoxicated from drinking alcohol and ingesting LSD and could not recall stabbing the victim, these circumstances did not show that his *sanity* would be a genuine issue either.

20

Furthermore, while Miller maintained that he had no memory of the stabbing, his statement to the Knoxville detectives contained many details prior to and immediately after the stabbing-component of the offense. Miller recalled the hard blows he delivered to her head and the resultant spewing of her blood. Miller also recounted that he knew she was dead because he observed that she had stopped breathing, and, as delineated earlier, gave an intricate accounting of his post-stabbing actions. *See Williams v. Collins*, 989 F.2d 841, 842 (5th Cir. 1993) (insufficient "threshold showing" where the sole proof of defendant's condition at the relevant time was in his codefendant's written statement describing defendant as a "homicidal maniac;"defendant testified that he had periodic hallucinations, flashbacks, and blackouts, due to heavy use of LSD and other drugs; and defendant did not testify as to his condition at time of incident but conceded that he remembered the main details of crime); *Collins v. State*, 506 S.W.2d 179, 184 (Tenn. Crim. App. 1973) ("Neither the defendant's professed inability to remember the crime nor the enormity of the crime is alone proof of insanity") (citations omitted).

Pursuant to Miller's own motions [Addendum 4, vol. 10, at 959: 20-22] mental health experts appointed by the state courts examined him to ascertain his competency to stand trial and his sanity at the time of the offense. Those mental examinations, though brief and far from comprehensive, resulted in determinations that Miller was both competent and sane. Therefore, even if Miller made the necessary factual showing that sanity would be a substantial issue at trial, he had access to a court-appointed psychiatrist on the sanity question[9] and the result reached by the state

---

[9] The precise holding of *Ake* as it applies to the guilt-phase of a capital trial has been a matter of debate in the Sixth Circuit. *See e.g., Smith v. Mitchell*, 348 F.3d 177, 208 n. 10 (6th Cir. 2003) (Because *Powell*'s holding was dicta, the state courts "cannot, therefore, violate AEDPA by holding that *Ake* merely requires a competent psychiatrist, and not an independent

21

supreme court in adjudicating these claims cannot be upset because that result was not contrary to
or an unreasonable application of Supreme Court precedent in 1984.

### (2) *Rebuttal expert*

There remains the matter of the expert psychological testimony introduced during the
prosecution's case-in-chief to rebut Miller's insanity defense, though Miller was denied a mental
health expert to help him cross-examine the witness. In his habeas petition, Miller characterizes this
as an *Ake* violation, while at trial he opposed the admission of the testimony on the basis of state
evidentiary law. ([Miller also moved to strike the testimony under the holding in *Estelle v. Smith*,
451 U.S. 454 (1981), but he has not raised that aspect of the claim in his § 2254 petition.) If the
admission of the testimony was an erroneous ruling under state law, as seemingly suggested by the
state supreme court's finding that no evidence of sanity had been adduced, such an issue is not
cognizable in habeas corpus proceedings unless it denies a defendant his fundamental right to a fair
trial and, thus, due process of law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

In this case, the psychiatric expert was neither a prosecution expert nor a defense expert, but

one."); *Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003) ( "[A]n indigent criminal defendant's
constitutional right to psychiatric assistance in preparing an insanity defense is not satisfied by
court appointment of a 'neutral' psychiatrist-i.e., one whose report is available to both the
defense and the prosecution.") (pre-AEDPA decision); *Mason v. Mitchell*, 320 F.3d 604, 616 (6th
Cir. 2003) ("[The] Supreme Court precedent has not clearly established a defendant's right to
more than mere access to competent psychiatric assistance."); *Thompson v. Bell*, 315 F.3d 566,
589 (6th Cir. 2003) ("[T]rial counsel sought a psychiatric evaluation of [petitioner], and the court
ordered one [and u]nder *Ake,* this is all [petitioner] would have been entitled to anyway.").
Clearly, given the discordance between the decisions, they offer no basis for concluding that the
legal principle Miller seeks to invoke was clearly established in 1984. *Smith v. Stegall*, 385 F.3d
993, 998 (6th Cir. 2004) (a court determining whether a legal rule of the Supreme Court has been
clearly established may regard other court's decisions).

instead a neutral expert appointed by the court. The expert's credentials were established—he was a board-certified psychiatrist who did some 25-50 forensic examinations per year and had been thus engaged for a number of years. [Addendum No. 4, vol. 11 at 949-40]. His testimony was relevant to Miller's mental condition. He was subjected to cross-examination, during which time the defense was able to highlight the brevity of the expert's mental evaluation and thereby call the reliability of the examination into question. Under these circumstances, the Court sees no due process violation in the introduction of Dr. Gee's testimony. *Mackey v. Dutton*, 217 F.3d 399, 407 n. 4 (6th Cir. 2000). At any rate, Miller has cited no well-settled Supreme Court precedent showing that the testimony of the court-appointed psychiatrist violated the Constitution.

### (3) *Harmless error*

In the alternative and in the interest of thoroughness, the Court will assume that Miller made a factual threshold showing that his sanity would be a substantial issue at trial and will assume further, as *Ake*'s author explained, that "*Ake* mandates the provision of a psychiatrist who will be part of the defense team and serve the defendant's interests in the context of our adversarial system." *Granviel v. Tex.*, 495 U.S. 963 (1990) (Marshall, J., dissenting from denial of a petition for certiorari). Under this interpretation of *Ake*, which is the one Miller espouses, his due process right was violated by the trial court's refusal to appoint an independent mental health expert. However, an *Ake* error is subject to harmless error review. *Tuggle v. Netherland*, 516 U.S. 10 (1995) (*Ake* error at sentencing remanded for Fourth Circuit to determine if harmless-error analysis is applicable); *Tuggle v. Netherland*, 79 F.3d 1386 (4th Cir. 1996) (found *Ake* errors harmless); *Liles v. Saffle*, 945 F.2d 333 (10th Cir. 1991) (denial of defendant's motion for state funds to employ a psychiatrist was error); and *Castro v. Okla.*, 71 F.3d 1502 (10th Cir. 1995) (error not to appoint expert psychiatrist

23

in sentencing phase).[10]

The Court applies the harmless error test articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which allows habeas relief only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A "substantial and injurious effect" exists when the court finds itself in "grave doubt" about the likely effect of the error on the jury's verdict; "grave doubt" exists where the issue of harmlessness is "so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). The harmlessness determination is based on "a *de novo* examination of the trial record." *Brecht*, 507 U.S. at 642.

The Tenth Circuit has concluded that, in cases where a direct appeal was pending when *Ake* was decided, as was Miller's, "the question presented is whether, upon review of the entire record, [petitioner] *could have* made a threshold showing under *Ake* that 'his sanity at the time of the offense is to be a significant factor at trial." *Liles*, 945 F.2d at 336 (citations and internal quotation marks omitted) (emphasis in original). The Court will employ the *Liles* approach here.

In 1977, Tennessee adopted the American Law Institute insanity test, which provides that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. *Graham v. State*, 547 S.W.2d 531, 543 (Tenn. 1977). At the time of the crime, an offense of first degree premeditated murder in Tennessee was

---

[10] *Terry v. Rees*, 985 F.2d 283 (6th Cir. 1993), also supports a harmless error analysis. The Sixth Circuit, after agreeing that Terry was unconstitutionally denied an independent pathologist to challenge the government's position as to the victim's cause of death, concluded that the trial court's error was harmless.

24

a willful, malicious, deliberate, and premeditated killing. *See* Tenn. Code Ann. § 39-2-202 (1979).

Miller argues that the trial court violated his constitutional rights by denying him an independent expert psychiatrist to testify as to his defenses of not guilty by reason of insanity and lack-of-premeditation-due-to-intoxication. Based on an exhaustive review of the complete state trial court record and the post-conviction record, this Court has located no evidence in the record demonstrating that Miller was insane or unable to form the requisite intent at the time of the murder.

a. *Synopsis of the Proof*

Charlotte Jane Campbell—an admitted drug addict, felony prisoner in the Knox County jail, and friend of Miller's—testified that, in the afternoon of May 20, 1981, between three o'clock and four o'clock, she and Miller purchased and consumed "acid" [i.e., LSD] at the Hideaway Lounge and that she took 1½ "hits" of what she believed to be a higher grade of LSD than she typically used because, thirty minutes later, she began a "trip" that lasted between 12 and 12½ hours. (Addendum 4, vol. 13, Campbell Test. at 1045-47, 1050-53). Ms. Campbell further stated that she was unaware of the quantity of hallucinogen Miller took or whether the drink he ordered at the bar was alcoholic, but that he was not "acting strange," even though his eyes were dilated and bloodshot and he "looked high." This witness also testified [somewhat contradictorily] that "you really couldn't tell he had done any acid" and that she last saw Miller at about 5:00 p.m., when they bid one another goodbye. (*Id*. at 1067, 1071-72). Ms. Campbell further stated, during cross examination, that she was able to remember the specific date on which these events occurred because on that same date, the "friend" she had been dating had just gotten a divorce and had presented her with an ultimatum—to stop taking drugs or their relationship would be terminated. (*Id*. at 1044-77).

25

However, despite Ms. Campbell's detailed recitation of the events on the afternoon of May 20, 1981, she was unable to recall the name of the LSD dealer at the Hideaway; the day of the week on which fell May 20th; the time she awakened on May 20th; what she did on May 21st or May 22nd; or what happened six days prior to the murder (i.e., May 14th)—the date of her Knox County court appearance, at which she pled guilty to marijuana possession, received an 11-month, 29-day sentence, and filed an application for probation. (*Id*. at 1062-63). Moreover, Ms. Campbell acknowledged that, at times, LSD has no effect on the person who takes it and that her first experience with LSD had had no effect on her. (*Id*. at 1060-61).

There was also testimony by Carol Sharp, an acquaintance of the victim's, that the two of them were standing in front of the YWCA building at 7:00 p.m. on May 20th, 1981; that, when Miller approached to pick up the victim, he appeared all right, neat, and clean; and that she noticed nothing unusual about his actions or his walk and detected no order of alcohol on him. (Addendum 4, vol. 5, Sharp Test. at 423-25). At 8:00 p.m. or prior to 8:40 p.m., three library employees saw Miller and the victim at the library. The employees described Miller as loud, belligerent, aggressive, smelling of alcohol, slightly intoxicated, and "noticeably" staggering or swaying. But they also variously testified that Miller understood instructions he was given; that he was able to articulate the information for which he searched; that his speech was clear and coherent; and that he even asked for the specific book he sought by its general call number. (Addendum 4, vol. 13 at 1077-1100 and vol. 14 at 1101-5).

Carolyn Jane Gann, also a friend of Miller's, testified that she saw Miller and the victim between 8:00 and 8:30 that evening at the Trailways restaurant when she served them coffee and a coke. (Addendum No. 4, vol.12 at 1114-15). Miller, who she said swayed and held onto the victim's

26

arm, spilled his coffee as he walked from the register to the table. (*Id.*) Ms. Gann testified that Miller eyes "were strange" and that he was intoxicated, though she was unable to distinguish whether his condition was due to alcohol or drugs. (*Id.* at1117). This witness also stated that her cabdriver friend had described Miller and the victim as "messed up" and had declined her request to take them to Miller's home. (*Id.* at 1119). Nonetheless, the duo left with the taxi driver at approximately 9:30 p.m. (*Id.*, p. 1122).

The taxi driver testified that at 9:30 p.m., after reaching an agreement with Miller to accept three dollars for the five-dollar fare, with the remaining two dollars to be paid later, Miller led the victim to the car and helped her get in. The cabdriver also stated that the victim seemed disoriented and had wet her pants but that Miller had spoken very rationally; given exact directions to his destination; and counted his money without any problem, paying the fare with two one-dollar bills and the rest in coins. According to this witness's testimony, Miller then opened the car door, helped the victim out of the taxi, and began leading her up the hill (presumably, towards the Thomas residence). The cab driver stated that Miller was perfectly normal, had no odor of alcohol about him, and gave no indication that he was under the influence of LSD (a drug with which the witness was familiar through his own use and that of his brother) and that, though the victim had no odor of alcohol about her, she was intoxicated and disoriented and her speech was slurred. (Addendum 4, vol. 5, James Shook test. at 463-83, 1030-32).

Lynn Stout, a former Knoxville Police Department officer who had provided security at the bus station during his off-duty hours, testified that he was having a conversation with the cab driver when Miller approached at 9:30 p.m. to inquire about getting a ride home. Officer Stout testified that Miller, who came as close as two feet to him, had a faint odor of alcohol about him, but

27

appeared to be in a normal state, spoke in a normal voice, did not behave abnormally, and even negotiated with the cab driver over the fare. The victim, however, was described as "either intoxicated or under the influence of drugs. She was not able to really move on her own that well." (Addendum No. 4, vol. 5, Stout test. at 441).

Thomas testified that, when he returned home from church that night at about ten o'clock, Miller acted normally, did not slur his speech, did nothing unusual, and was not drunk, but might have had a beer or two. However, during cross-examination, Thomas admitted that, in a prior statement, he may have said that Miller was intoxicated and relatively calm, but that as he recalled at that very moment, Miller was not drunk, but may have had a few beers. (Addendum No. 4, vol. 6, Thomas test. at 504-06, 598-99).

b. *Analysis*

i) *Sanity*: At 7:00 p.m., Miller picked up the victim and, according to the victim's friend, he seemed fine. At the library, around 8:00 pm to 8:40 p.m., the library staff described him as loud and combative and having an odor of alcohol about his person, but nothing about his appearance or behavior caused the witnesses who saw him there to question his sanity, as he was able to identify to the employees the book which he wanted, follow their directions to go upstairs to the fine arts desk, followed the fine arts librarian down the stacks to the specific area where the book was shelved, located the book, and checked it out. Also, Miller was able to communicate with the taxi driver without any difficulty, negotiate with him for payment of the fare, and give him exact directions to the West Hills residence. To the police officer, Miller appeared to be in a normal state and his behavior and speech were likewise normal. There is not a hint of insanity in Miller's appearance, demeanor, or conversation before the crime.

28

Moreover, Thomas, who returned home while the basement floor was still wet from Miller's efforts to clean up the blood, did not observe anything unusual about Miller's behavior and, when he inquired about the blood, Miller had the presence of mind to manufacture an explanation, i.e., that he had gotten into a fight and received a bloody nose. Thomas did not present any testimony that would have suggested that, immediately after the murder, Miller was insane.

Indeed, Thomas testified that he thought Miller had watched television and had drunk a beer, but that nothing about Miller that evening, May 20, 1981, caused him pause or made him think that something was wrong with Miller. Interestingly enough, that very evening, Miller offered to repay Thomas for the ruined carpet because he had "messed it up." [Addendum 4, vol. 15, at 1439, Miller's Interview Tr. at 6] . Miller's acknowledgment that he was responsible for the blood stains on the carpet begs the question as to whether he likewise realized that he was accountable for the profound wounds inflicted on the victim which engendered the blood stains.

And, most importantly, after the crime, had Miller been insane (which, under Tennessee law, meant that, as a result of a mental disease or defect, he was unable to appreciate the wrongfulness of his actions or conform his actions to the law), he would not have realized that killing the victim was wrong and there would have been no reason to try to hide her body, attempt to dispose of her clothing and the blood-stained throw rug, wash the blood out of the house and basement, or lie to Thomas about the origin of the blood. Miller's post-murder conduct shows an appreciation for the wrongfulness of his actions.

Although there is arguably some evidence suggesting Miller has some type of mental or emotional disturbance, it appears that the evidence was insufficient to make the requisite showing under *Ake* that Miller's sanity at the time of the offense was likely to be a significant factor in his

29

defense. Miller self-reported that he "heard voices which stopped about three months ago, calling his name, telling him to do this, that or the other and so forth . . . ," yet nowhere in the record does Miller state that he was hearing voices at the time he committed the crime and no independent witnesses testified to any actions on his part which would indicate that he was hearing voices.

Unlike the *Ake* defendant, insanity was not Miller's sole defense. It is clear from the record that he also asserted, as defenses, the lack of premeditation—the mental element of first degree murder—and that the prosecution had failed to prove, beyond a reasonable doubt, that he was the actual killer.

Additionally, the defendant in *Ake* had been found mentally incompetent and was rendered competent for trial attendance only with the administration of strong anti-psychotic medication. Here, Miller had informed Dr. Gee that neither he nor his family had a history of mental illness. Moreover, Miller presented nothing to demonstrate that he was then mentally ill; that he had ever had a diagnosis of mental illness; or that he had been treated in the past for any type of mental disturbance. *Cf. Mackey v. Dutton*, 217 F.3d 399, 410 (6th Cir. 2000) (finding that a defendant whose sole defense is insanity and who previously had been diagnosed with a serious psychotic disorder had shown that sanity was likely to be a significant issue at trial).

And, unlike the defendant in *Ake*, there is not the slightest suggestion that Miller engaged in any kind of bizarre behavior during the state criminal proceedings. Indeed, according to the trial court, his conduct was commendable. (Addendum 3, vol. 2, "Report of Trial Judge: Capital Cases," ¶ 16: "The defendant maintained a quiet, composed and calm demeanor throughout the trial.").

Finally, the claimed period of insanity, apparently, spanned only the thirty minutes it took

30

to commit the murder. The record contains no evidence that Miller has had any recurring periods of insanity since May of 1981 or that he has undergone or been prescribed any psychological therapy or mental health treatment, including medications. Thus, Miller's insanity, seemingly, manifested itself for one-half hour or less.

ii) *Premeditation*: In Tennessee, a defendant's "voluntary intoxication to the extent that he is deprived of the mental capacity to form specific intent is a defense to a charge involving a specific intent crime." *State v. Shelton,* 854 S.W.2d 116, 121 (Tenn. Crim. App. 1992) (citing *Harrell v. State,* 593 S.W.2d 664 (Tenn.Crim.App.1979)). The underlying rationale for this particular defense is this: Where an element of the crime is a particular intent and where a defendant who is intoxicated lacks the capacity to entertain that specific intent, then a crime has not been committed because the intent element is missing. *Harrell*, 593 S.W.2d at 670. However, "[t]he determinative question is not whether the accused was intoxicated, but what was his mental capacity." *Id.* at 672.

Miller claims that his conviction cannot stand since he lacked the necessary intent because his intoxication from alcohol or drugs robbed him of the capacity to premeditate the murder. The evidence, however, undercuts this claim.

Although Miller's friends testified that he was very intoxicated, the disinterested parties who testified, such as the people who worked at the library, did not support defense's argument that Miller was too intoxicated to form the requisite intent. First, Miller engaged in a courtship with the victim, who had slight diffused brain damage at birth; who had attended special education classes during her school career; and who was obviously mentally slow. When describing their relationship, Miller characterized it as a one-way love affair on the part of the victim. One witness, who was with

31

the victim around 7:00 p.m., just hours before the murder, testified that the victim appeared nervous while she waited for Miller and that her hands were shaking. Thus, the evidence could have easily led the jury to believe that Miller preyed on his mentally-challenged victim.

The record reflects that Miller bought a hallucinogenic drug earlier that afternoon, and there was testimony by one of his witnesses that the cab driver had described the pair as "messed up." In addition, the witness observed that the victim appeared to be intoxicated. More specifically, the witness explained that the victim's eyes were almost closed and that she had wet her pants. The cab driver described the victim as disoriented and intoxicated. Therefore, the jury could have inferred that the victim was impaired—by alcohol or drugs; could have inferred further that Miller was implicated in that impairment; and ultimately could have concluded that he had planned the crime prior to or after arriving at the residence.[11]

Additionally, the amount of time in which the criminal act was accomplished could easily indicate premeditation. The record reflects that Miller's roommate spent every Wednesday away from the residence at church from 6:00 p. m. until 10:00 p. m. Almost like clockwork, the roommate returned home between 10:00 p. m. and 10:15 p.m.—a fact of which Miller surely would have been aware Thomas had also forbidden Miller to bring women to his home when he was absent, though Miller twice failed to abide by this rule. (Addendum 4, vol. 5 at 491-93). The proof shows that Miller and the victim walked up the hill to the residence at approximately 9:30 p.m.; that Miller's

---

[11] In Miller's Rule 59(e) motion, he suggests that his violent actions might well have been "the product of the interplay between his serious mental illness and the effect of the powerful drugs which he and the victim had just consumed.." [Doc. 87 at 9]. The victim's blood was not tested for LSD or other drugs. The Court has found no *direct* evidence that the victim had taken drugs, though certainly a factfinder could draw that inference from the evidence.

32

roommate drove into his garage at or shortly after 10:00 p.m.; and that, as the roommate got out of his car, Miller, clothed only in wet jeans, was crouching halfway down the basement stairs. This crime occurred in approximately thirty minutes, beginning in the living room where Miller initially hit the victim with the fire poker. Within that short time span, Miller pulled the body to the kitchen; stripped off her clothing, except her socks; brutalized her body with a knife (and, perhaps, used a hammer to drive the knife through parts of her bone); went downstairs to the basement; retrieved a rope; returned upstairs; wrapped the rope around the victim's neck and tied her hands up over her head; dragged the body outside; disposed of her clothing and a rug; cleaned up a substantial amount of the blood in the house; and cleaned the basement floor. The fact that he was able to complete these grisly tasks in such a short time frame, along with his conduct immediately afterwards (giving false explanations for the blood, sitting on the sofa, calmly watching television, while Thomas read a newspaper, etc.), provides evidence from which the jury could have concluded that he had committed this crime with premeditation. "Calmness immediately after a killing may be evidence of a cool, dispassionate, premeditated murder." *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992) (citations omitted).

iii) *Reasonable Doubt*: Miller also offered the reasonable doubt defense. This defense was based on the claimed failure of the prosecution to establish beyond a reasonable doubt that he was the killer, since Thomas, his roommate, former homosexual consort and, ultimately, father-figure, just as likely could have committed the murder, or at the very least, could have been an accomplice to the crime. Miller's attorney conducted a rigorous cross-examination of Thomas, during which counsel undermined the credibility of this witness and suggested, through his questioning, that the witness might have aided and abetted the murder. That defense was also vigorously pursued during

33

Miller's closing argument, when counsel suggested that Thomas might have found Miller and the victim engaging in sexual activity; that Thomas could have killed her in a jealous rage; and that Miller could have admitted the crime to protect Thomas. [Addendum 4, vol. 15a at 1203-1213]. That this defense resonated with the jury is evinced, seemingly, by the jury's request to have replayed the recordings of Thomas's call to the 911 dispatchers and Miller's Knoxville confession to the police detectives. The jury, presumably, made this request for the purpose of comparing the two recordings and, ultimately, of helping it decide the fate of Miller's reasonable doubt defense. (Addendum 4, vol. 15 at 1155-1156).

iv) *Findings.* In this case, the Court has reviewed the record and does not find that the presumed *Ake* error on the part of the trial court had an injurious effect on the jury's verdict. About this, the Court harbors no grave doubt. As was explained in the prior opinion and reiterated here, there is nothing in the state court record and nothing offered to this Court showing that there was a substantial question as to Miller's sanity.

This would be so even if the Court were to consider the expert affidavits offered for the first and only time in this habeas matter and ignore the fact that Miller failed to take advantage of the opportunity during his state post-conviction proceedings to obtain psychiatric experts to develop his *Ake*-related claims of ineffective assistance. By passing on his opportunity to present evidence to establish that, at the time of the offense, he was insane or incapable of forming intent, he likewise passed on his chance to make a showing of prejudice for the failure to present the defense.[12]

---

[12] On April 28, 1995, Miller filed a "Post-Conviction Motion for Funds," to pay for assistance from mental health and other experts [Addendum No. 34 at 54], and a "Supplement to Petition for Post-Conviction Relief,"alleging, in relevant part, several *Ake*-based illustrations of ineffective assistance of counsel. [*Id.* at 138 ]. The post-conviction record contains no order

34

Nevertheless, as observed in the subject memorandum opinion, Miller presented, by affidavit, declaration, and report, the expert opinions of: (1) Pablo Stewart, M.D., a forensic psychiatrist, who reported that Miller was suffering from neurocognitive disorders, including post-traumatic stress disorder ["PTSD"] — a type of anxiety disorder—and severe depression, that his symptoms of mental disease were present and acute on the day of the murder, that these acute symptoms rendered him unable to appreciate the criminality of his acts or conform his conduct to the requirements of the law, and that his intoxication exacerbated his underlying mental impairments and further eroded his ability to understand and conform his conduct to that required by law; (2) Thomas M. Hyde, M.D. and Ph.D., a behavioral neurologist, who reports that, by history, petitioner meets the criteria for bipolar disorder with both depressed and manic episodes, that his mental disease was exacerbated by frontal and temporal lobe brain damage, which his history indicates existed prior to his 1982 trial, and that this, along with his substance abuse at the time of the crime, would "impact" his ability to conform his conduct to the requirements of the law; and (3) David Lisak, Ph.D, a clinical psychologist, who reports that, as a result of the horrific violence and abuse—physical, emotional and sexual—to which the petitioner was subjected in his childhood and youth, he harbored profound

---

addressing the motion for funding for experts and no filing by petitioner drawing the trial court's attention to the pending motion and asking for a ruling. The record does include a copy of an April 1, 1996 order dismissing the petition. On appeal, the petition was remanded for an evidentiary hearing, which occurred "[o]n November 14, 1997, after allowing petitioner additional time to prepare. . . . Petitioner, despite ample opportunity, presented no testimony. The petitioner chose not to testify. The prior record of these proceedings was introduced. After over six years, the petitioner presented no testimony to support the factual allegations in his petition and supplemental petition." [Addendum No. 33, Order of April 23, 1998, at 16] Miller met the qualifications to request expert services pursuant to Tenn. Code Ann. § 40-14-207(b), as it authorized expert services if necessary for the protection of the constitutional rights of indigent defendants. *See Owens v. State*, 908 S.W.2d 923 (Tenn. 1995) (concluding that, in a post-conviction case filed in February, 1991, the statute applies to post-conviction capital cases).

levels of rage, focused primarily towards women, and that the nature of the wounds inflicted on Lee Standifer strongly suggest that he killed her in a fit of rage, occasioned by heavy drinking and ingestion of LSD.

At certain points, these experts' opinions are inconsistent with one another or with the record. First, Dr. Stewart recounts that Miller had hallucinations upon awakening, when intoxicated and when not intoxicated. Stewart Decl. ¶ 33. The Court understands this statement to mean that Miller experienced hallucinations at all times. Dr. Steward also states that, at the time of the murder, Miller was depressed, with marked functional impairment, morbid preoccupation with worthlessness, suicidal ideation, and psychotic symptoms, including auditory and visual hallucinations. *Id.* ¶ 33. But Dr. Hyde reports that, according to Miller, the visual hallucinations were infrequent and ceased altogether around 1980. The latter expert also states that Miller's auditory hallucinations were intermittent and, while Miller perceived them as threatening and commanding at times, the voices never told him to harm himself or others. Hyde Report, p. 2.

Dr. Stewart has diagnosed Miller as suffering from PTSD, an anxiety disorder and the most intense kind of learned fearfulness, which lowered his threshold stimuli, and this expert has found that, at the time of the offense, the "sudden tactile stimuli" [of the victim grabbing Miller's arm] resulted in Miller feeling a *single* instance of overwhelming terror. Stewart Decl. ¶37. Ostensibly, the overwhelming terror he felt prompted his violent attack on the victim. Yet, Dr. Lisak reports that there were at least *five* verifiable episodes where Miller, sometimes armed with a weapon, violently assaulted women. All of these episodes occurred prior to the murder, do not appear to involve any sudden tactile stimuli on the victim's part, and seem to have been initiated by Miller. Lisak Decl., ¶¶31-33, 62-64.

36

Dr. Stewart relates that Miller first took LSD in his early teens, but disliked its negative effects (i.e., paranoia), though he thought it helped his depression. Dr. Stewart also states that Miller's substance abuse developed as a result of his effort to self-medicate his anxiety and depression. Stewart ¶¶ 41, 44. Dr. Hyde also notes that Miller has suffered from intermittent depression since childhood but that, while he is suspicious, he denies any history of paranoid delusions and has not experienced problems with anxiety. Hyde Report, p. 2.

Dr. Stewart quotes psychiatric authorities as explaining that "[a]nxiety symptoms, including panic attacks....are common during depressive disorders, and depression is a common complication of anxiety states."[13] Stewart Decl., ¶37. To the extent that this quotation implies that Miller is also plagued with these symptoms, Dr. Hyde recounts that "Miller has not experienced problems with anxiety or panic attacks." Hyde Report, p. 2.

Dr. Stewart concludes that the "[e]ssence" of Miller's mental state at the time of the crime was that, as a result of his PTSD, he was mentally and physically hyper reactive. Thus, the victim's grabbing his arm and digging her nails into Miller was the emotional trigger for a flashback of his mother seducing him and his stepfather assaulting him. Dr. Stewart also opines that Miller's memory of events is fractured, that he has no memory of stabbing the victim, and that his accounting of the event is based on what he was told by police officers. Stewart Decl. ¶¶46-47 & 49. What seems strange about this expert's assessment of Miller's mental status during the murder is that the record shows that Miller recalled with clarity the primary segments of the event–those which both

---

[13] Dr. Stewart's declaration contains many and sometimes lengthy quotations from psychiatric literature, but he does not explain whether Miller suffered from the maladies described in the quotations.

preceded and followed the stabbing.[14] Furthermore, Dr. Stewart's determination that the murder resulted from Miller's PTSD-driven hyper reaction to a touching or grabbing of his arm is seemingly at odds with Dr. Lisak's opinion that the circumstances of the victim's death are consistent with a rage killing. Drs. Stewart and Lisak looked at the same circumstances of the murder and reached different conclusions, with Dr. Lisak finding that the murder scene reflected a killing propelled by rage and Dr. Steward interpreting those same circumstances as reflective of a hyper reactive killer, who harbored no intent to kill or malice for the victim, and whose actions were taken without premeditation, an understanding of the difference between right and wrong, and the ability to appreciate the criminality of his actions.

There are other examples of these experts reaching different opinions based on what should have been the same facts. According to Dr. Stewart, Miller began to perseverate on biblical teachings concerning Thomas's sexuality, with the obvious implication being that such a relationship was contrary to Christian dogma . Yet, Dr. Hyde reports that Miller is not very religious. Stewart Decl. ¶45; Hyde Report, p. 2.

---

[14] For example, Miller related that he and the victim entered the house via the kitchen door; that they went to the living room to chat; that he told her he was leaving; that she grabbed his arm; that he hit her hard in the face; that her "blood sprayed all over when he hit her"; that he dragged her to the kitchen, where he undressed her because her clothes were bloody and he wanted to "keep from getting so much blood all over everything"; that he went to the basement, where he retrieved a rope; that he tied her up and dragged her downstairs, through the basement and the yard and into a wooded area; that he disposed of her clothing; and that he went back inside and started rinsing everything down. Miller also had specific recollections of the method he used to sober up [sprayed cold water on himself from a garden hose]; the timing of Thomas' return home ["just about the time that [Miller had] finished cleaning the basement"]; Thomas' verbatim response to the condition of his residence ["I can't put up with this shit"]; and Miller's post-crime behavior [watched television and fell asleep on the couch].

38

Dr. Hyde suggests that medications and psychiatric treatment could have deflected Miller from engaging in impulsive and violent behavior, yet the record does not show that Miller has taken medications of this nature or has had any psychological treatment since the murder and Dr. Hyde states that Miller is taking no medications at the present time. Moreover, there is no indication in any of the experts' reports or declarations that Miller has had any PTSD-related flashbacks since May of 1981, that he had any such flashbacks before that date, or that he has engaged in any violent hyper reactions to any post-crime stimuli.

Given the inconsistencies and contradictions between these experts' reports, had they been called to testify at the trial on the issues of sanity and premeditation, it is likely that their testimony would have served to confuse and not to persuade the jury. In the Court's opinion, constructing an insanity defense on the PTSD-flashback and overreaction-to-arm-grabbing explanation for the crime would not have been feasible. Furthermore, these experts assessed Miller's mental status many years after the murder, whereas the Helen Ross McNabb evaluations and Dr. Gee's examination were performed within weeks and months of the murder. Granted, there is uncontroverted affidavit testimony from Dr. Hyde showing that Miller sustained brain damage as a result of the abuse, but there is no showing that this brain damage rendered him insane or incapable of premeditation on May 20, 1981. On these facts, neither an insanity defense or a lack-of-capacity defense was available to Miller and, if there was an *Ake* violation, it did not substantially influence the jury's verdict.

For all these reasons, the Court hews to its prior opinion that the state courts' rejection of the claim that Miller had a constitutional entitlement to his own psychiatrist at trial was not contrary to or an unreasonable application of the controlling Supreme Court precedent.

        v) *Evidentiary hearing*

39

In his final *Ake*-related claim, Miller maintains that he did not fail to develop evidence of his mental disorders in state court and argues that the Court's finding that he did overlooks *Williams v. Taylor*, 529 U.S. 420 (2000), where the "failed to develop"phrase contained in 28 U.S.C. § 2254(e) was explained. This phrase, according to the *Williams* court, refers to a lack of diligence on the part of an attorney who fails to "make a reasonable attempt, in light of information available at the time, to investigate and pursue claims in state court." Miller insists that the expert affidavits offered in these habeas proceedings cannot be excluded from consideration on the basis that he failed to develop that evidence in state court. True, Miller was diligent in pursuit of an independent psychiatric expert during the trial, the first direct appeal, the re-sentencing, and the second direct appeal. The record also indicates that he moved for an expert to assist him in developing his post-conviction claim that his attorney gave him ineffective assistance by failing to present mental health experts at trial. However, there is no indication in the record that the post-conviction court ever ruled on that motion, that Miller ever called this omission to the state court's attention, or that he pressed for such a ruling.

Moreover, when the appellate court remanded Miller's post-conviction petition for an evidentiary hearing, the record does not show that he renewed his motion for an expert or asked the post-conviction court to rule on his earlier motion. Instead, the transcript of the evidentiary hearing reveals that he voluntarily dismissed the claim that his attorneys gave him ineffective assistance for failing to present expert testimony with respect to his mental condition; that he failed to present any testimony by his attorneys or anyone else on his behalf; and that he offered no new evidence, but chose to rely on the trial and appellate record, which had already been considered by the state courts.

These latter actions by his post-conviction attorney speak of a lack of diligence and a failure

40

to develop expert testimony to support his claim, at least with respect to his *Ake*-related claim of ineffective assistance. *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) (instructing that a petitioner shows prejudice by establishing that the new post-conviction evidence differs in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing). Therefore, the Court adheres to the ruling in its March 25, 2005 Memorandum Opinion denying Miller an evidentiary hearing.

## 2. *Burden-Shifting Jury Instructions [Pet., Claim III]*

According to Miller, the trial court committed a *Sandstrom* error when he charged the jury on the elements of premeditation, malice and deliberation. *See Sandstrom v. Mont.*, 442 U.S. 510 (1979) (An instruction which allows a jury to presume malice, an element of the offense, is unconstitutional because it shifts the State's burden of proof to the defendant).

In his Rule 59 motion to alter or amend, Miller "agrees with the Court's conclusion that he must pass over a higher hurdle to demonstrate that the state court's admitted *Sandstrom* error had a substantial and injurious effect" [sic] on his capital trial under *Brecht v. Abrahamson* than he must in order to demonstrate that the Tennessee Supreme Court had unreasonably applied *Chapman v. California.*" (Doc. 87 at 8). Miller contends, however, that because of this conclusion, the Court's rejection of this claim turns entirely upon whether Miller's case is factually distinguishable from the case presented to the Sixth Circuit Court of Appeals in *Caldwell v. Bell*, 288 F.3d 838 (6th Cir. 2002), which resolved the *Sandstrom* error under the higher *Brecht* standard. It matters not, he insists, that *Caldwell* was a pre-AEDPA decision.[15]

---

[15] With Miller's last contention, the Sixth Circuit does not agree. *See e.g.*, *Hall v. Vasbinder* 563 F.3d 222, 232 (6th Cir. 2009) ("While this court has held that pre-*Miranda*

41

According to Miller, the Court must consider the affidavits of Drs. Stewart, Hyde, and Lisak, which he believes makes the question of whether Miller possessed the requisite ill will to constitute malice a very close question. The Court disagrees that it must consider the affidavits of these experts and hews to its conclusion in the original Memorandum that Miller's case is factually distinguishable from the *Caldwell* case.

As an initial matter, the Court technically applies the *Brecht* standard through the AEDPA lens. However, since the stricter *Brecht* test subsumes the AEDPA standard, which is based on *Chapman v. California*, 386 U.S. 18 (1967), a habeas court simply applies *Brecht* and asks whether Miller has shown that an error had a substantial and injurious effect on his jury's verdict. *Wilson v. Mitchell*, 498 F.3d 491, 504 (6th Cir. 2007) (citing *Fry v. Pliler*, 551 U.S. 112 (2007)). The Court applied the *Brecht* standard in its earlier analysis, though it also reviewed the state court's harmless error decision to determine whether it was objectively unreasonable under the strictures of § 2254(d). It now appears that, in light of *Fry,* the latter review was implanted in the *Brecht* analysis.

Secondly, Miller's argument (i.e., that the affidavits of Drs. Stewart, Hyde, and Lisak, which the jury and Tennessee appellate courts were denied the opportunity to consider, must be taken into account in determining the harmlessness of the *Sandstrom* error) did not appear in connection with his *Sandstrom* claim in the habeas petition or his motion for summary judgment. (Docs. 18, 27). Because this argument has never been raised previously, it is untimely and barred. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) ("Putting aside the issue of the correctness of the argument, the Lac Vieux raised it tardily. . . . Because the Lac Vieux

---

silence cannot be used as substantive evidence of guilt, it did so under a pre-AEDPA, de novo standard of review. It is, therefore, not controlling in this case.") (citations omitted).

could have, but did not, raise their argument before the district court ruled on the motion to compel compliance, the argument is barred.").

Furthermore, when the Court granted the motion to expand the record with these expert affidavits, it did not rule that it would consider those affidavits in resolving the habeas petition. Nor did Miller indicate, in his motion, that the affidavits supported his *Sandstrom* claim. Not until his Rule 59(e) motion did he assert that these affidavits must be considered. Miller's argument does not qualify as "newly discovered evidence" under a Rule 59(e) motion, since he could have made this argument prior to the Court's ruling on his summary judgment motion. And refusing to consider these affidavits in relation to the *Sandstrom* error would not work a manifest injustice, because Miller could have requested expert services to assist him when his post-conviction case was remanded for an evidentiary hearing and because the record shows that he did not press the trial court for expert services or support his *Sandstrom* claim with these affidavits.

In addition, the Supreme Court has stated:

> Consistent with the jury-trial guarantee, the question . . . the reviewing court [is] to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which "the jury *actually rested* its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.

*Sullivan v. La.,* 508 U.S. 275, 279 (1993) (citations omitted)(quoting *Yates v. Evatt,* 500 U.S. 391, 404 (1991)(emphasis in original)). It appears that some of the evidence upon which the experts relied in their affidavits was not introduced by sworn testimony during the state court proceedings.

43

For example, Dr. Lisak reached his conclusions in reliance on Miller's allegation that his mother physically and sexually abused him, but there is no sworn testimony supporting those allegations in the state court record, or at least those related to sexual abuse. Including these experts' declarations and affidavits in a harmless-error review would alter the basis upon which the jury actually rested its verdict.

Given the strong evidence of malice adduced at trial, the Court does not have grave doubt about the harmlessness of the improper malice instruction as it is confident that the instruction did not influence the jury to find a malicious murder or, if it did, that the effect was very slight. *See Burger v. Kemp*, 483 U.S. 776, 782, n.5 (1987) ("[T]he evidence was so dispositive of intent that it can be said beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption") (citations and internal quotation marks omitted). For the above reasons, the Court will not consider the experts' affidavits in connection with Miller's *Sandstrom* claim.

Having now rejected Miller's sole argument in his Rule 59(e) motion to support modification of the *Sandstrom* ruling, the Court sees no basis to depart from its previous conclusion that, under *Brecht*, the *Sandstrom* error was harmless because it did not have an injurious and substantial effect on the jury's verdict at the guilt-innocence stage of trial.

This remains so even after examination of the two Ninth Circuit cases Miller offers as authority to supplement Claim III. (Docs. 93-94). In *Medley v. Runnels*, 576 F.3d 857 (9th Cir. 2007), a state court defendant was convicted of murder and received a sentencing enhancement for discharging a firearm while committing a felony. The definition of a "firearm" in the enhancement statute, according to the trial court's instruction, was met by the flare gun the defendant had used in the crime. Holding that the instruction was constitutionally infirm because it "took a critical issue

44

of fact away from the jury" and relieved the prosecution of its duty to prove beyond a reasonable doubt that the defendant used a firearm, the Ninth Circuit granted habeas relief. Miller's case is distinguishable on its facts. While the challenged instructions in Miller shifted the burden of proof on the element of malice, they did not take the issue of malice away from the jury. The jurors were still free to find that the killing was not malicious.

In the second case, *Chambers v. McDaniel*, 549 F.3d 1191 (9th Cir. 2009), the defendant, a chef by trade, had become angry when he returned to his room to find his roommate cooking cocaine on one of the knives he used in his profession. The two began to fight and, according to defendant, his roommate initially stabbed him with a knife, but defendant wrested the knife away from his roommate and stabbed him back, in self-defense, killing him. Defendant claimed, and the Ninth Circuit agreed, that his due process right was violated by an instruction on premeditation which had relieved the State of the burden of proof on whether the killing was deliberate as well as premeditated. The Ninth Circuit reasoned that the entire case was focused on petitioner's state of mind when he got into an altercation with the victim and on whether he acted in self defense *vel non*. Again, the Court finds that *Chambers* is factually distinct from Miller's case. Miller did not claim that he and his victim engaged in an altercation; that he was provoked by anything she did; or that he acted in self-defense.

## B. **Claims Not Adjudicated**

The final claims which are the subject of the motion to alter or amend were found to have been procedurally defaulted for various reasons.

1. *Jury Instructions-Sentencing [Pet., Claims IX & X]*

45

In these claims, Miller challenges jury instructions at sentencing as burden-shifting, alleging that they passed to him the burden of showing that mitigating circumstances outweighed aggravators and that those instructions were vague and overbroad. He points to his supplemental initial brief in the Tennessee Supreme Court during the second direct appeal, listing "five unbriefed issues," which were disposed of in one sentence: "Defendant lists five unbriefed issues which we have considered and found to be without merit." *Miller v. State*, 771 S.W.2d 401, 405 (Tenn. 1989). Miller asserted that Claims IX and X were among those five unbriefed issues. Thus, it is his contention that these claims were not procedurally defaulted, as the Court found, but were exhausted since they were reviewed on the merits. Alternatively, he claims that in keeping with its statutory duty under Tenn. Code. Ann. § 39-2-205(c), the Tennessee Supreme Court "implicitly" reviews a claim of unconstitutional sentencing instructions on direct appeal, even if such a claim is not affirmatively raised.

In order to unearth the "unbriefed" issues, this Court reviewed the cited brief, which reasserted and incorporated numerous previously-filed motions, including Miller's "impose-a-life-sentence" motion. In the latter motion, petitioner alleged that the state death penalty statute was unconstitutional in its treatment of the burden of proof, in that it required *the jury* to decide whether mitigating factors existed and whether they outweighed the aggravators. This is not the same claim offered to this Court as Claim IX, which was based on the allegation that the instructions assigned *to Miller* the burden of showing that mitigators outweighed aggravators. The Court reaffirms its finding that this jury-instruction claim was not raised in the petitioner's second direct appeal because the motions he incorporated in his application to the state supreme court do not contain the same claim and further finds that the state supreme court did not resolve this particular claim by denying

46

relief on the "unbriefed" issues. Petitioner's failure to pursue his claim first in the state courts operates as a procedural default.

But even if there is no procedural default, the Supreme Court has "never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988) (citing *Zant v. Stephens*, 462 U.S. 862, 875-876, n. 13 (1983)). Moreover, a state is permitted "to structure and shape consideration of mitigating evidence." *Boyde v. Cal.*, 494 U.S. 370, 377 (1990). Even though these cases post-dated the alleged improper instructions given at Miller's trial, he points to no Supreme Court ruling to the contrary which was well-established federal law at the time of his resentencing in state court. Furthermore, Tennessee's capital sentencing statute at the time of the crime clearly assigned to the prosecutor the burden of showing, beyond a reasonable doubt, that aggravators existed, but did not assign any burden of proof whatsoever as to mitigating factors since the jury was permitted to find that any mitigating factor outweighed any aggravating factor. *State v. Melson*, 638 S.W.2d 342, 368 (Tenn. 1982); Tenn. Code Ann. § 39-2404 (repealed).

As to Miller's second claim of burden-shifting instructions [Claim X], this Court's challenged opinion read: "The state court clearly and explicitly held that this claim had been waived, and the state court's finding and enforcement of waiver with respect to the jury instructions on the heinousness factor constitutes a procedural default. " (Doc. 85 at 18) (citations omitted).

Miller's argument on both claims—implicit review—is constructed on the statutorily-mandated review which the Tennessee Supreme Court must conduct in a capital case. *See* Tenn. Code Ann. § 39-13-206(c)(1). This review includes a determination as to whether the evidence supports the jury's finding of aggravating circumstances, whether the evidence supports its finding

47

that the aggravators outweigh mitigating circumstances, and whether the sentence is excessive or disproportionate to the penalty in similar cases. *Id.* This comparative proportionality review is undertaken "to ensure that the death penalty is applied consistently and not arbitrarily or capriciously." *State v. Rommer*, 250 S.W.3d 12 (Tenn. 2008) (citations omitted); *State v. Hugueley*, 185 S.W.3d 356, 393 (Tenn. 2006). The claims under consideration pertain to jury instructions. Because burden-shifting jury instructions is not one of the criteria specified in the state's mandatory review statute, there is no reason to believe that these instructions were reviewed under the mandatory review rule.

> Recently, when presented with a somewhat similar issue, the Sixth Circuit stated:
>
> [Petitioner] argues that the Tennessee Supreme Court exhaustively reviewed the record for all possible claims: "the [court] expressly stated that '[a]fter consideration of . . . the entire record,' it found 'no reversible error . . . committed at trial.'" This mischaracterizes the Tennessee Supreme Court's review; it examined the record pertaining to the issues [petitioner] raised, but those claims he did not present remain defaulted. *See Baldwin v. Reese*, 541 U.S. 27, 31 (2004) (a petitioner does not "fairly present" a federal claim to a state court for exhaustion purposes if the court must look beyond a petition or brief to find material alerting it to the claim).

*Zagorski v. Bell*, No. 06-5532, 2009 WL 996307, at \* 10 (6th Cir. Apr. 15, 2009). The analysis in *Zagorski* suggests that Miller cannot rely on "implicit review" to avoid a procedural default of a claim not listed in the statute and not fairly presented to the state courts.

Miller's main and alternative arguments on his jury-instruction claims are both rejected. The Court stands by its earlier statement that "[e]xhaustion simply has not occurred where the state courts have not been provided a 'fair opportunity' to consider and decide the same claims of constitutional error presented to a federal habeas court" and by its prior finding of procedural default. (Doc. 85 at 15-18).

48

## 2. *Premediation-Repeated Blows [Pet., Claim VII]*

In this claim, Miller maintains that insufficient evidence supported the finding of premeditation. However, he did not respond or object to the State's assertion that he had procedurally defaulted one part of his claim, i.e., that repeated blows were inadequate to show premeditation. Miller did not offer this particular argument to the state courts and his failure to do so constitutes a procedural default. Alternatively, if there were no procedural default because, as Miller correctly observes, he need not replicate his state claim word-for-word in his federal petition, so long as he has fairly presented the state courts with the substance of the claim, this Court's discussion of the remaining parts of Claim VII in the "Adjudicated Claims" section of the challenged opinion encompasses review of the "repeated blows" argument, despite the finding of procedural default. The Court declines to alter or amend its prior decision with respect to this claim.

## 3. *Sentencing Claims [Pet., Claims XV, XVI, XVIII, XIX & XXIV]*

These claims involve penalty-phase issues, such as jury instructions, unconstitutional state death penalty statute, and flawed proportionality review on the part of the state supreme court. Miller reasserts that, contrary to the Court's opinion, he did not procedurally default these claims, but exhausted them via the "implicit review" method. The "implicit review" argument is rejected for this set of claims, save the first and last ones, for the same reasons it was rejected in the previous claims.

The initial claim in this category, Claim XV, expressly was held to have been waived by the state court. The last claim in this grouping, Claim XXIV, alleges flaws in the proportionality review performed by the state supreme court. Proportionality review is a listed criterium in the statute and,

thus, the Tennessee Supreme Court had a statutory duty to conduct it. During Miller's second direct appeal, the highest state court cited to Tenn. Code Ann. § 39-2-205 and ruled: "We have carefully reviewed the sentence of death to determine whether it is excessive or disproportionate to the penalty imposed in similar cases and we find the sentence to be appropriate considering both the nature of the crime and the defendant." *State v. Miller*, 771 S.W.2d 401, 405 (1989). Though this claim was explicitly reviewed, the Court found alternatively that, based on *Pulley v. Harris*, 465 U.S. 37, 50 (1984), "even if this claim had been raised and exhausted in the state courts, the Constitution does not require comparative proportionality review." (Doc. 85 at 45). Miller points to no Supreme Court case which overrules *Pulley*.

## V. CONCLUSION

Having found that *Teague v. Lane* does not bar the application of *Ake v. Oklahoma* to Miller's case, his Rule 59(e) motion will be **GRANTED** in part [only as to that facet of the motion]. However, with respect to all other aspects of the motion, in the absence of any showing that the Court made a clear error of law, that the law has changed substantially, or that failure to grant the motion would result in a manifest injustice, Miller's Rule 59(e) motion will be **DENIED**.

An appropriate order will follow.


**ENTER**:

_Leon Jorda_

LEON JORDAN
UNITED STATES DISTRICT JUDGE

50